SCUDI & AYERS, LLP
Morgan J.C. Scudi (SBN 147942)
J. Ray Ayers (SBN 217706)
Lucas I. Mundell (SBN 310367)
5440 Morehouse Drive, Suite 4400
San Diego, California 92121
Phone: (858) 558-1001
Fax: (858) 558-1122
Lucas@RDLFG.com

Attorneys for Roque "Rocky" De La Fuente

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROQUE "ROCKY' DE LA FUENTE, )<br><br>Plaintiff, )<br><br>vs. )<br><br>STATE OF CALIFORNIA and ALEX )<br>PADILLA, CALIFORNIA )<br>SECRETARY OF STATE, )<br><br>Defendants. )<br> ) | **CASE NO. 2:16-cv-03242-MWF-GJS**<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS, OR ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Hon. Michael W. Fitzgerald<br>Ctrm. 5A<br>Date: July 24, 2017<br>Time: 10:00 a.m. |

**<u>TABLE OF CONTENTS</u>**

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.     INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.    STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

     A.    THE PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

     B.    MR. DE LA FUENTE'S PRESIDENTIAL CAMPAIGN. . . . . . . . . . .  2

     C.    CALIFORNIA'S STATUTORY SCHEME.. . . . . . . . . . . . . . . . . . . . .  4

     D.    THE ACTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

     E.    PADILLA'S PENDING MOTION. . . . . . . . . . . . . . . . . . . . . . . . . . .  5

JUDGMENT ON THE PLEADINGS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

     I.     STANDARD FOR JUDGMENT ON PLEADINGS. . . . . . . . . . . . . . .  6

     II.    THERE ARE FACTUAL ISSUES WHICH MUST BE RESOLVED
           AND PREVENT JUDGMENT ON THE PLEADINGS. . . . . . . . . . . .  7

     III.   PADILLA'S FACIAL VS. APPLIED ARGUMENT IS A RED
           HERRING.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

     IV.   IF THE COMPLAINT IS DEFICIENT IN ANY WAY, MR. DE LA
           FUENTE SHOULD BE GIVEN LEAVE TO AMEND. . . . . . . . . . . .  13

SUMMARY JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

     I.     STANDARD FOR SUMMARY JUDGMENT. . . . . . . . . . . . . . . . . .  14

     II.    PADILLA'S MOTION FOR SUMMARY JUDGMENT SHOULD BE
           DENIED FOR FAILURE  TO COMPLY WITH L.R. 56-1. . . . . . . . .  15

     III.   PADILLA'S MOTION FOR SUMMARY JUDGMENT SHOULD
           BE DENIED BECAUSE HE FAILED TO MEET HIS BURDEN OF
           PRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

     IV.   PADILLA'S MOTION FOR SUMMARY JUDGMENT MUST
           BE DENIED BECAUSE THERE ARE DISPUTED ISSUES OF
           MATERIAL FACT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

A.    THE LEVEL OF SCRUTINY. . . . . . . . . . . . . . . . . . . . . . . . . . 19

B.    THE QUESTION FOR THE COURT IS WHETHER A REASONABLY DILIGENT CANDIDATE CAN BE EXPECTED TO SATISFY CALIFORNIA'S REQUIREMENTS BY OBTAINING THE REQUIRED NUMBER OF VALID SIGNATURES IN THE TIME ALLOWED. . . . . . . . . . . . . . . 21

C.    THE CASES RELIED UPON BY PADILLA DO NOT SUPPORT HIS REQUEST FOR SUMMARY JUDGMENT. . . 23

    1.    NADER V. CRONIN. . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    2.    CROSS V. FONG EU. . . . . . . . . . . . . . . . . . . . . . . . . 26

D.    THERE ARE MATERIAL ISSUES OF FACT WHICH REQUIRE THAT THE COURT DENY PADILLA'S MOTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    1.    CALIFORNIA'S INDEPENDENT PRESIDENTIAL BALLOT ACCESS STATUTE UNDULY BURDENS THE CONSTITUTIONAL RIGHTS OF MR. DE LA FUENTE AND THE VOTERS AT LARGE. . . . . . . . . . . 28

    2.    PADILLA'S ARGUMENTS AS TO THE BURDEN IMPOSED BY CALIFORNIA ARE UNCONVINCING. 29

    3.    THE ONEROUS REQUIREMENTS OF CALIFORNIA ELECTION CODES §§8400 AND 8403 ARE NOT NECESSARY TO PROTECT CALIFORNIA'S INTEREST IN PREVENTING BALLOT OVERCROWDING AND AVOIDING VOTER CONFUSION. . . . . . . . . . . . . . . . 30

V.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Celebrezza*, 460 U.S. 760 (1983). . . . . . .  7, 12, 15, 19, 20, 26, 28, 29, 33

*Anderson v. Liberty Lobby, Inc*., 477 U.S. (1986). . . . . . . . . . . . . . . . . . . . . . . . . .  28

Ariz. Green Party v. Reagan, 838 F.3d 983 (9th Cir. 2016). . . . . . . . . . . . . . . . . . .  20

Ariz. Libertarian Party v. Reagan, 798 F.3d 723 (9th Cir. 2015). . . . . . . . . . . .  20, 21

Bergland v. Harris, 767 F.2d 1551 (11th Cir. 1985). . . . . . . . .  9, 16, 17, 19, 25, 27, 33

Bowe v. Bd. of Election Comm'rs of City of Chicago,

614 F.2d 1147 (7th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 10

Burdick v. Takushi, 504 U.S. at 434. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 20, 28

Cartwright v. Barnes, 304 F.3d 1138 (11th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . .  9

Celotex Corp. v. Catrett, 477 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Chamness v. Bowen, 722 F.3d 1110 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . .  29

Coffield v. Kemp, 599 F.3d 1276 (11th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . .  9

Cross v. Fong Eu, 430 F. Supp. 1036 (N.D. Cal. 1977). . . . . . . . . . . . . . . . . . 23, 26, 27

Dwyer v. Regan, 777 F.2d 825 (2d Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

Foman v. Davis, 371 U.S. 178 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,

313 F.3d 305 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

Green Party of Ga. & Constitution Party of Ga. v. Georgia,

U.S. Dist. 98793 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Green Party of Ga. v. Georgia,

551 F. App'x 982 (11th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . .  9, 10, 18, 19, 33

Green Party of Ga. v. Kemp,

171 F. Supp. 3d 1340 (2016). . . . . . . . . . . . . . . . . . . .  10, 11, 13, 20, 26, 33, 34

Jenness v. Fortson,

403 U.S. 431 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 9, 25

Mandel v. Bradley,
      432 U.S. 173 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

Miller v. Rykoff-Sexton, Inc.,
      845 F.2d 209 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Morongo Band of Mission Indians v. Rose,
      893 F.2d 1074 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Munro v. Socialist Workers Party,
      479 U.S. 189 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

 Nader v. Cronin,
      620 F.3d 1214 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 25, 30

Pub. Integrity All., Inc. v. City of Tucson,
      836 F.3d 1019 (9th Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Sheppard v. Beerman,
      18 F.3d 147 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Storer v. Brown,
      415 U.S. 724 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 22, 23, 30

T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,
      809 F.2d 626 (9th Cir.1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Triton Energy Corp. v. Square D. Co.,
      68 F.3d 1216 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Williams v. Rhodes,
      393 U.S. 23 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

**STATUTES**

Cal. Election Code §8400. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 6, 31

Cal. Election Code §8403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 6, 31

Cal. Election Code §8650. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

O.C.G.A §21-2-170. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 15. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

1   Plaintiff ROQUE "ROCKY" DE LA FUENTE hereby submits the following
2   Opposition to Defendant ALEX PADILLA'S Motion for Judgment on the Pleading, or
3   Alternatively, Motion for Summary Judgment

4   **I.     INTRODUCTION**

5   This case is a challenge to California's highest in the nation petition signature
6   requirement for independent presidential general election candidates. The last person to
7   successfully navigate this obstacle was self-financed billionaire and independent
8   candidate Ross Perot, in 1992.

9   Mr. De La Fuente ran a self-financed campaign for President in 2016. California
10  required almost 180,000 verified signatures in 2016, gathered in a 105 day window. In
11  2020, the requirement will grow to more than 200,000 verified signatures (as it is set at
12  1% of registered voters). California's signature requirement was over 21% of all
13  signatures required to access the ballot in all 50 states, plus the District of Columbia.

14  Defendant Padilla argues that this statutory scheme is constitutional on its face,
15  without the need for the Court to look beyond the pleadings at actual facts as to how the
16  statutes work in practice. Therefore, Padilla submitted no evidence of the burdens
17  imposed by, or reasons for, such a large signature requirement. Padilla offers no evidence
18  that the State's interest in avoiding an overcrowded ballot requires a signature
19  requirement even remotely close to the number called for by California.

20  Mr. De La Fuente will show that California's statutory scheme is not constitutional
21  as a matter of law, and that he is entitled to a trial on the merits of this scheme in
22  practice. Mr. De La Fuente submits evidence, including the Declaration of a well
23  respected election law/ballot access expert, which will demonstrate that even 5,000
24  signatures is sufficient to prevent an overcrowded ballot.

25  Padilla fails to show that this case is appropriate for determination based solely on
26  the pleadings. He fails to offer material evidence to support the request for summary
27  judgment, and he fails to identify the facts which are undisputed. For these reasons and
28  more which are set forth below, the Court must deny Padilla's Motion

## II.    STATEMENT OF FACTS

### A.    THE PARTIES

Plaintiff Roque "Rocky" De La Fuente is a prominent international businessman from San Diego, California, who began his political career in 1992.  DLF Decl. at ¶ 3. Defendant Alex Padilla is the Secretary of State for the State of California.  As part of his duties as Secretary of State, Padilla is charged with the duties of Chief Elections Officer of California.

### B.    MR. DE LA FUENTE'S PRESIDENTIAL CAMPAIGN

Mr. De La Fuente ran for president in 2016, and conducted a nationwide campaign.  DLF  Decl. at ¶ 10. In California, Mr. De La Fuente was selected by California Secretary of State Alex Padilla to appear on the Democratic primary ballot in California. DLF Decl. at ¶ 4.

Without the support of Democratic Party insiders and apparatus, or equal access to public debates, Mr. De La Fuente came in 3rd in the California Democratic primary. DLF Decl. at ¶ 5. However, Mr. De La Fuente continued his campaign for President as an independent candidate, and made significant effort to appear on the general presidential ballot in states throughout the country. DLF Decl. at ¶ 11.

California requires a hopeful independent presidential candidate to gather verified petition signatures equal to 1% of the entire registered voter population in California. Cal. Elec. Code § 8400. In 2016, that number was 178,039. Winger Decl. at ¶ 13. The California Election Code imposes an additional hurdle, by requiring that the requisite number of signatures be gathered in a 105-day window. Cal. Elec. Code § 8403.

Based on his experience gathering campaign signatures in 2016, Mr. De La Fuente calculated that the cost to gather a sufficient number of verified signatures to qualify by petition would be approximately $3,000,000-4,000,000 dollars. De La Fuente Decl. at ¶ 18. This is because any prudent would-be candidate must obtain a significant number of signatures beyond the statutory requirement, to account for inevitable disqualified signatures.  Winger Decl. at ¶ 21.

In light of the cost-prohibitive petition requirements in California, Mr. De La Fuente reasonably allocated the majority of his resources to getting on the general election ballot in other states with less onerous requirements. DLF Decl. at ¶ 8.

For example, Mr. De La Fuente was the first person in recent memory to get on the Democratic primary ballot in North Carolina via petition signatures. DLF Decl. at ¶ 12. North Carolina's primary petition requirement was only 10,000, but Mr. De La Fuente needed over 18,000 signatures to get slightly more than 10,000 'qualified' signatures. *Id*.

Mr. De La Fuente nevertheless still hoped to compete in California, where he was born and his children still live. Mr. De La Fuente attempted to qualify as a certified 'write-in" candidate on the California general presidential election ballot.  DLF Decl. at ¶ 9.  California requires submission of 55 certified elector forms to qualify as a certified write-in candidate. Cal. Elec. Code § 8650.

Mr. De La Fuente secured and submitted (in excess of) the required 55 voter/elector pledges to become a qualified write-in candidate. DLF Decl. at ¶ 9. However, the San Diego Election Office rejected many of the forms because of alleged address "discrepancies,".  *Id*.

Mr. De La Fuente continued his nationwide campaign during the general election portion of the 2016 campaign, ultimately appearing on over 20 general election ballots in other states via petition.  DLF Decl. at ¶ 11.  Mr. De La Fuente was able to do so because his campaign gathered approximately 200,000 petition signatures throughout the country. *Id.* Mr. De La Fuente also qualified as a certified write-in candidate in an additional 8 states. DLF Decl. at ¶ 14.

Mr. De La Fuente's nationwide campaign efforts, largely self-financed, cost in excess of $8 million dollars. DLF Dec. at ¶ 18. In California, Mr. De La Fuente spent approximately $500,000.

Of the 1780 individuals that registered with the FEC as candidates for president in 2016, Mr. De La Fuente finished 8th overall in the general election popular vote. DLF

Decl. at ¶ 17.

## C. **CALIFORNIA'S STATUTORY SCHEME**

As explained in detail in the accompanying Declaration of Mr. De La Fuente's election law and ballot access expert, Richard Winger, California's statutory scheme is one of the most burdensome in the nation, and its requirements far exceed what is reasonably necessary to avoid an overcrowded ballot or voter confusion. [1]

California requires more petition signatures for independent presidential candidates than any other state (178,039 for the 2016 election). Only 11 states require more than 10,000 petition signatures from an independent presidential seeking access to the general election presidential ballot.   Only 7 states require more than 25,000 signatures. Only 4 states require more than 45,000 signatures. Winger Decl. at ¶ 27.

Although election statutes are often couched in terms of a percentage of registered voters or actual voters in prior elections, this is a poor means of determining the burden imposed by the statutes signature requirement.[2] Winger Decl. at ¶ 27.

California's 105-day window to gather 178,039 qualified signatures compounds the burden imposed by the California statutory scheme on independents, because most other states do not have a "start date" before which would be candidates are prohibited from gathering signatures.   The deadline to submit signatures is generally of little

---

[1] As detailed in his Declaration, Mr. Winger is a nationally renowned election law and ballot access expert, who has been widely published, interviewed by national media, and who has been qualified as an expert witness in election law cases around the Country. In *Green Party of Ga. v. Kemp*, a case involving a statute almost identical to California's current system (1% of registered voters, but only 50,000 total signatures required), the Court accepted Mr. Winger's analysis and adopted his proposed solution by invalidating the statute and reducing the required number of petition signatures to 7,500, pending further legislative action. 171 F. Supp. 3d 1340, 1356 (N.D. Ga. 2016). The Court did so by granting Plaintiffs' Summary Judgment motion, and the Eleventh Circuit affirmed. *Green Party of Ga. v. Kemp*, No. 16-11689, 2017 U.S. App. LEXIS 1769, at *1 (11th Cir. Feb. 1, 2017).

[2] Moreover, statutes which use percentages of registered voters exacerbate the problem, because of the 'deadwood' on all state voter rolls. Winger Decl. at ¶ 27. Invariably, state voter registration rolls over count the potential number of voters by a significant margin. *Id.*

---

(certainly much less) consequence, if no start date is prescribed, as the potential candidate has a much larger window to gather signatures. Winger Decl. at ¶ 15.

Under California's statutory scheme, only self-financed billionaire Ross Perot, has made the general election presidential ballot in California via independent candidate petition. Decl Winger at ¶ 23; see also *Green Party of Ga. v. Kemp*, 171 F. Supp. 3d 1340, 1351 (N.D. Ga. 2016) (" Ross Perot used "millions of dollars from his own personal fortune" to fund his campaigns and petition drives, including his successful qualification as an independent presidential candidate in 1992. ...""").

As explained in detail in Mr. Winger's declaration, California does not need anywhere close to 178,039 signatures to ensure that the presidential ballot is not overcrowded, or to avoid voter confusion or administrative difficulties. Winger Decl. at ¶ 28. If a state has petition signature requirement of more than 5,000 votes, it will avoid these problems, without unnecessarily burdening potential independent candidates who need to obtain these signatures in 50 states plus the District of Columbia to be on the ballot nationwide. Id at ¶ 29.

### D.   THE ACTION

Mr. De La Fuente brought this action during the 2016 campaign, for legal and equitable relief against the State of California and Secretary of State Mr. Alex Padilla, challenging the unduly burdensome requirements imposed by California Election Codes §§ 8400 and 8403 on would-be independent presidential candidates. Mr. De La Fuente alleges that these provisions together constitute a violation of his rights and the rights of the voters under the First and Fourteenth Amendment (Due Process).  First Am. Compl. [Dkt. # 30] at 1:19-20, 2:8,18.

### E.   PADILLA'S PENDING MOTION

Mr. De La Fuente is compelled to point out what he believes are fatal deficiencies in Defendant Padilla's Motion. The Motion is not supported by any extrinsic evidence of the burden on independent candidates, such as Mr. De La Fuente. Padilla's Motion does not include a Separate Statement of Uncontroverted Facts and Conclusions of Law,

as required by Local Rule 56-1, nor does it otherwise identify allegedly undisputed facts or the alleged absence of evidence to support an element of Mr. De La Fuente's claims.

Padilla's Motion does not identify, via evidence, opinion, or argument, what he claims actually constitutes a "crowded ballot" or "voter confusion." In defending the petition signature requirement (179,083), Mr. Padilla offers no evidence to support this number, or any evidence that a lower number would cause any harm.

Defendant Padilla cites deadlines to submit signatures in other states, but fails to provide the Court with said States' "start date," which would be required to undertake any 'apples to apples' analysis of the burden imposed by California's 105 day window to obtain signatures.

Finally, Padilla's argument in support of summary judgment is largely based on the mistaken assumption that all paths to the general election ballot are equal. Padilla spends considerable time and effort devoted to other potential avenues to the general election ballot, such as major party primaries or formation of a qualified minor party. In reliance on this improperly broad framing of the issue, he uses the total number of candidates on California's prior general election ballots as his primary evidence in support of the Motion. Exh. 7-19 to Medley Decl.

However, as Mr. De La Fuente will make clear below, Padilla has improperly framed the issue by increasing the scope of the inquiry. The issue is not how many candidates have or can access the ballot by all the various avenues offered in combination. Rather, the proper question before the Court is how difficult it is for a would-be independent candidate to access the general election presidential ballot in California using the petition procedure in California Election Code §§ 8400 and 8403.

## JUDGMENT ON THE PLEADINGS

### I.      STANDARD FOR JUDGMENT ON PLEADINGS

"In deciding a Rule 12(c) motion, we apply the same standard as that applicable to a motion under Rule 12(b)(6)." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir. 1994). "[A] court must accept the allegations contained in the complaint as true, and

1    draw all reasonable inferences in favor of the non-movant." *Id*.

2         "Judgment on the pleadings is appropriate only in rare circumstances—namely
3    where "the material facts are not in dispute and a judgment on the merits can be rendered
4    by looking to the substance of the pleadings and any judicially noticed facts." *Great*
5    *Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir.
6    2002)."Pleadings should be construed liberally, and judgment on the pleadings is
7    appropriate only if there are no disputed issues of fact and only questions of law remain."
8    *Id*.

9         The Court must apply the dismissal standards with particular strictness in favor of
10   the Defendant, where the Complaint asserts a civil rights claim. See e.g. *Dwyer v. Regan*,
11   777 F.2d 825, 829 (2d Cir. 1985) and cased cited therein.

12   **II.   THERE ARE FACTUAL ISSUES WHICH MUST BE RESOLVED AND**
13   **PREVENT JUDGMENT ON THE PLEADINGS**

14        Contrary to Defendant Padilla's claims in his moving papers, this case cannot be
15   decided simply be reference to the Amended Complaint and the operative statutes.
16   Rather, the question of whether a statutory electoral scheme is unconstitutional must be
17   determined by 1) a thorough consideration of the facts which render the statute an undue
18   burden or not, depending on the circumstances, and 2) the state's alleged interests in
19   regulating presidential elections by means of the statutory scheme being challenged. See
20   *Anderson v. Celebrezza*, 460 U.S. 760, 786-88 (1983).

21        The *Anderson* balancing approach is an inherently fact intensive process.
22   However, Defendant Padilla relies largely only on the statute itself, and fails to even
23   address the pertinent facts which this Court must consider in determining if Mr. De La
24   Fuente's right to participate in the political process was unduly burdened by the statutes
25   as applied.

26        In evaluating the statutory scheme, the Court does not simply apply a formulaic
27   analysis inputting the total number or percentage of signatures required, along with the
28   operative window of time to obtain such signatures, to determine if it passes

1  Constitutional muster.

2      Instead, the Court must look at the statutory scheme's practical application in light

3  of history and other factors outside of the four corners of the statutory scheme itself.

4  "[T]he Supreme Court has consistently taken an intensely practical and fact-oriented

5  approach to deciding these election cases." *Bowe v. Bd. of Election Comm'rs*, 614 F.2d

6  1147, 1152 (7th Cir. 1980)

7      The *Bowe* Court went on to examine Supreme Court precedent in this area. It

8  noted that, the Supreme Court previously "explored the tangled web of restrictions

9  imposed which, taken together, made it virtually impossible for a third party to ever

10  qualify for the ballot." *Id*., referencing  *Williams v. Rhodes*, 393 U.S. 23, 89 S. Ct. 5, 21

11  L. Ed. 2d 24 (1968).

12          Similarly, in *Jenness v. Fortson*, 403 U.S. 431, 91 S. Ct. 1970,
        29 L. Ed. 2d 554 (1971), the Court explored the actual
13          historical impact of the statute in reaching the conclusion that
        Georgia had not frozen the status quo, but rather had
14          recognized the potential fluidity of American political life.

15  *Id*.

16      Finally, the *Bowe* Court cited to *Storer v. Brown*, where the Supreme Court

17  vacated judgment and remanded the case "for the development of a better factual record

18  as to the actual impact of the signature requirement as it worked in conjunction with

19  other aspects of California's election regulations." *Id*., referencing *Storer v. Brown,* 415

20  U.S. 724, 742, 94 S. Ct. 1274, 39 L. Ed. 2d 714 (1974). "The ultimate question was ...

21  whether in the context of California politics, a reasonably diligent candidate could be

22  expected to be able to meet the requirements and gain a place on the ballot." *Id*.

23      A perfect example of the need for a factual record to determine whether a statute's

24  actual impact is unconstitutional is *Green Party of Ga. v. Kemp*. 171 F. Supp. 3d 1340,

25  1348 (N.D. Ga. 2016). In *Green*, the Court initially found that Georgia's statutory

26  scheme requiring petitions to qualify for the presidential ballot as an independent to

27  obtain signatures equal to a 1% of registered voters in the last presidential election

28  constitutional. It proceeded to dismiss Plaintiff's Complaint in response to a via a

12(b)(6) Motion to Dismiss, primarily relying on the fact that Georgia's prior statutory

scheme requiring 5% of registered voters had been found constitutional by prior Courts,

including the Supreme Court in *Jenness v. Fortson*.

> Challenges to Georgia statutory scheme similar to those asserted by Plaintiffs have been unsuccessful in the past. *Jenness v. Fortson*, 403 U.S. 431, 91 S. Ct. 1970, 29 L. Ed. 2d 554 (1971) (upholding the 5 percent  petition requirement under Georgia law); *Cartwright v. Barnes*, 304 F. 3d 1138 (11th Cir. 2002) (upholding 5 percent petition requirement under Georgia law); *Coffield v. Kemp*, 599 F. 3d 1276 (11th Cir. 2010) (upholding Georgia's 5 percent petition rule as not "too burdensome"). In each of these instances, the Courts held that the requirement under O.C.G.A. § 21-2-170 for a petition containing at least 5 percent of the registered voters for certain elections was not unconstitutional. Accordingly, the Court concludes that the requirement that a petition contain 1 percent of the registered voters would not be unconstitutional. Therefore, Plaintiff's Complaint is due to be dismissed.

*Green Party of Ga. & Constitution Party of Ga. v. Georgia*, No. 1:12-CV-1822-RWS,

2012 U.S. Dist. LEXIS 98793, at *4 (N.D. Ga. July 17, 2012).

On appeal, the Eleventh Circuit reversed and remanded. It found that the District

Court improperly looked only to the statutory scheme, and failed to consider the relevant

context and facts outside of the pleadings and statutory scheme itself, which are required

for a proper analysis under *Anderson*.

> In *Anderson*, the Court rejected "the use of any 'litmus-paper test' for separating valid from invalid restrictions." [Citations omitted]. Rather, a court must first "evaluate the character and magnitude of the asserted injury to rights protected by the First and Fourteenth Amendments. Second, it must identify the interests advanced by the State as justifications for the burdens imposed by the rules. Third, it must evaluate the legitimacy and strength of each asserted state interest and determine the extent to which those interests necessitate the burdening of the plaintiffs' rights.

*Green Party of Ga. v. Georgia*, 551 F. App'x 982, 983 (11th Cir. 2014), citing *Bergland*

*v. Harris*, 767 F.2d 1551, 1553-54 (11th Cir. 1985).

> The same analysis we applied in Bergland also applies to this case. The district court's approach employs the type of "litmus-paper test" the Supreme Court rejected in *Anderson*. And, the district court failed to apply the Anderson balancing approach.

*Green Party of Ga. v. Georgia*, 551 F. App'x at 984 (11th Cir. 2014), citing *Anderson*, supra, 460 U.S. at 789.

On remand, the District Court in *Green Party of Ga.* was presented with evidence from the Plaintiffs in the form of their own declarations, as well as declarations from election law expert, Richard Winger. The Court noted that it was required to engage in an "intensely practical and fact-oriented approach to deciding these election cases." *Green Party of Ga. v. Kemp*, 171 F. Supp. 3d 1340, 1356 (N.D. Ga. 2016), citing *Bowe v. Bd. of Election Comm'rs of City of Chicago*, supra, 614 F.2d at 1152-53 (7th Cir. 1980). "Only now does the Court have the evidence before it to engage in this "practical and fact-oriented" analysis." *Id.*

After the presentation of evidence by the parties in Cross-Motions for Summary Judgment, the Court not only found that there were issues of fact which precluded judgment in favor of the Georgia Secretary of State, it found that Georgia's reduced 1% requirement was unconstitutional in actual application and enjoined its enforcement. *Green Party of Ga. v. Kemp*, supra, 171 F. Supp. 3d at 1372.

In doing so, the *Green Party of Ga.* Court relied heavily on the declarations of the Plaintiffs themselves and Mr. Winger, which demonstrated that Georgia's 1% requirement was unduly burdensome, and unnecessary to protect legitimate state interests.

> In support of their Motion for Summary Judgment, Plaintiffs submit an affidavit by Richard Winger that discusses Georgia's ballot access requirements in the context of other states' restrictions. (2015 Winger Aff., Dkt. [76-3].) Mr. Winger also submits an appendix of historical voting data in support of his assertions in his affidavit. (App'x to 2015 Winger Aff., Dkt. [76-3] at 6-22.) Mr. Winger opines that "if a state requires even slightly more than 5,000 signatures for an independent presidential candidate, or the presidential candidate of an unqualified party, to get on the ballot, it will never have a crowded presidential general election ballot." (2015 Winger Aff., Dkt. [76-3] ¶ 1.) The data he submits show that, of the 401 instances in which a state required independent candidates or candidates of an unqualified party to collect more than 5,000 signatures, no candidate was able to access the ballot 33% of the time. (Id. ¶ 4.) One candidate was able to access the ballot 20% of the time; two candidates, 20%; three

candidates, 13%; four candidates, 8%; five candidates, 4%; and six candidates were able to qualify only 4% of the time. *Green Party of Ga. v. Kemp*, supra, 171 F. Supp. 3d at 1348.

> Plaintiffs provide evidence of the costs of collecting petition signatures. Political bodies may employ paid petitioners to collect signatures. Tom Yager, co-chair of the national Green Party's access committee, states that in his experience, a paid petitioner charges about $2 per signature, in addition to lodging and travel expenses. (Pls.' SOMF, Dkt. [76-2] ¶ 15.) Because signatures may be invalidated for a variety of reasons, Mr. Yager attempts to collect more signatures than the required number. For the approximately 50,000 signatures required to access the 2016 ballot in Georgia, the Green Party finds it would be "prudent to collect about 78,000 raw signatures to ensure a sufficient number of valid signatures." (Id. ¶ 17.) Mr. Yager estimates that a statewide petition drive in Georgia would cost about $140,00 to $150,000. (Id.)Other political body officials estimate the costs differently: Hugh Esco, former Green Party candidate, estimates that the cost of securing over 50,000 valid signatures would be approximately $175,203 plus qualifying fees. (Id. ¶ 21.) Ricardo Davis, state chairman of the Constitution Party of Georgia, estimates that the cost of achieving the Constitution Party's minimum petitioning goal of 70,000 signatures would run from $70,000 to $350,000. (Id. ¶ 20.)

*Id* at 1350.

> While Plaintiffs' candidates have been unable to access the ballot in Georgia, both the Green Party and the Constitution Party's candidates have been included on other states' ballots. For example, in 1996, the Constitution Party's presidential candidates appeared on the ballot in 41 states. (2012 Favorito Aff., Dkt. [7-3] ¶ 2.) Additionally, the Green Party's ranks have included "roughly 150 publicly elected officials" at any one time. (2012 [**21] Esco Aff., Dkt. [7-1] ¶ 7 (stating that in 2012, the Green Party had 133 elected officials from 22 states and the District of Columbia).) The Green Party has also achieved some success with its presidential candidate, Mr. Nader, who was listed on 46 state ballots and won nearly three percent of the popular vote nationally in 2000. (Id. ¶ 11.)

*Id* at1351.

As it pertains to Defendants' Motion for Judgment on the Pleadings in this action, the very fact that the Court was obligated to consider both this extrinsic evidence and the application of the statute in practice (both historically and as applied to Plaintiffs), means that Mr. De La Fuente's case cannot be decided simply from looking within the four corners of the Amended Complaint and at the statutory scheme.

The Supreme Court has long held that decisions regarding the Constitutionality of provisions such as those at issue herein require a fact and reason based analysis of the various competing interests, which by definition cannot be done simply from reference to the operative pleading.[3]

> Constitutional to specific provisions of a State's election laws therefore cannot be resolved by any "litmus paper test" that will separate valid from invalid restrictions. [Citation omitted.] Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. [Citations omitted.] The results of this evaluation will not be automatic; as we have recognized, there is "no substitute for the hard judgments that must be made."

*Anderson v. Celebrezze*, 460 U.S. 780, 789-90, 103 S. Ct. 1564, 1570 (1983). Simply stated, the Court cannot engage in the required analysis via a Motion for Judgment on the Pleadings.

Moreover, Defendant Padilla fails to address Mr. De La Fuente's allegations, taken as true for purposes of this Motion to Dismiss, that no independent candidate has qualified under California's scheme since 1992, and that Mr. De La Fuente enjoys a significant modicum of support nationally and in the State of California. [Dkt. # 30] at ¶¶ 5-6. Defendant Padilla even concedes that he determined that Mr. De La Fuente was "generally advocated for or recognized throughout the United States as actively seeking

---

[3] Defendant Padilla has offered no additional facts properly subject to judicial notice which would permit the Court to find in its favor as a matter of law. The fact that more than five total candidates have been on the California ballot for the last several presidential elections does not automatically render the statute constitutional. Indeed, as explained below, the analysis fails to address the issue before the Court, which is an independent candidate's ability to reach the ballot via petition. As Mr. De La Fuente will show, only 2 such candidates have reached the ballot in this manner since 1892.

---

the nomination of the Democratic Party for President of the United States, in placing Mr. De La Fuente on the Democratic primary ballot. [Dkt. # 49-1] Padilla MSJ P&As at 1:26-2:6.

## III. PADILLA'S FACIAL VS. APPLIED ARGUMENT IS A RED HERRING

Padilla argues that Mr. De La Fuente's claims are ripe for determination simply from a review of the Amended Complaint, because it is a facial challenge. "The distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court." [Citation omitted.] That is, "[a]n 'as applied' challenge is a claim that the operation of a statute is unconstitutional in a particular case while a facial challenge indicates that the statute may rarely or never be constitutionally applied." [Citations omitted.]." *Constitution Party of Pa. v. Cortes*, 824 F.3d 386, 394 (3d Cir. 2016)

Mr. De La Fuente does not admit that the challenge is only facial in this case. Rather, the challenge is both facial and as applied. In any event, a facial challenge to this type of statute does not render extrinsic evidence unnecessary. As the case law cited extensively herein makes clear, the Court must have factual information to properly undertake the *Anderson* balancing test. See e.g. *Green Party of Ga. v. Kemp*, 171 F. Supp. 3d 1340 (Court considered extensive evidence from the parties before invalidating entire statute and reducing petition requirements for all candidates). The case law is replete with examples of ballot access laws found unconstitutional on their face, based on evidence of their impact on the parties and others.

## IV. IF THE COMPLAINT IS DEFICIENT IN ANY WAY, MR. DE LA FUENTE SHOULD BE GIVEN LEAVE TO AMEND

To the extent that the Court finds that the Complaint in its current form fails to state a claim, leave to amend should be granted. Mr De La Fuente can plainly allege additional facts which would state a viable claim. The facts submitted in support of this Opposition can be alleged in an amended pleading, and would state a claim that California's Statutory Ballot Access Scheme Violates Constitutionals Rights of Mr. De

La Fuente and voters generally.

There has been no undue delay or bad faith on the part of Mr. De La Fuente, no prejudice to Defendant, and amendment would not be futile. *See* Fed. R. Civ. P. 15(a) (Leave to amend "shall be freely given when justice so requires."); *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990) ("Thus, Rule 15's policy of favoring amendments to pleadings should be applied with "extreme liberality.""); see also *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222, (1962) and *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988) (Amendment is futule "only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense."

## SUMMARY JUDGMENT

## I.   STANDARD FOR SUMMARY JUDGMENT

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

"If, and only if, the moving party has sustained its initial burden, the nonmoving party must demonstrate there is a dispute as to material facts on the elements that the moving party has contested, including in the form of affidavits. In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor; rather, it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).

"The opposing party's evidence is to be believed, and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing

party. Inferences may be drawn from a nonmoving party's direct and circumstantial evidence to establish a genuine issue of material fact so long as such evidence was of sufficient "quantum or quality."" Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1222 (9th Cir. 1995).

## II.   PADILLA'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED FOR FAILURE  TO COMPLY WITH L.R. 56-1

Local Rule 56-1 requires any "party filing a notice of motion for summary judgment" to "lodge a proposed "Statement of Uncontroverted Facts and Conclusions of Law" setting forth "the material facts as to which the moving party contends there is no genuine dispute."

This requirement is not merely procedural or insignificant. Rather, the Statement of (allegedly) Undisputed Facts forms the foundation from which the Court is to analyze the Motion for Summary Judgment, in order to determine 1) the facts which Padilla claims are undisputed, 2) if these purported facts are supported by admissible evidence, 3) whether such facts are indeed undisputed, and/or 4) what elements of Mr. De La Fuente's claim Padilla asserts have no evidentiary support.

Mr. De La Fuente's claim is not a simple negligence or breach of contract case, where the failure to explicitly identify undisputed facts or to point out a particular element on which there is alleged to be failure of proof might be overlooked because it is obvious to all the facts or elements at issue. Instead, this case must be decided based on fact intensive *Anderson* balancing test comparing the burden placed on the Constitutional rights Mr. De La Fuente seeks to vindicate, with the interests the state puts forth as justification for the burden. *Anderson v. Celebrezze*, supra, 460 U.S. at 789 ("[T]he Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.").

Given that Defendant Padilla's Motion and supporting papers fails to lay out in plain language the material facts which he contends are undisputed, or where he contends

Mr. De La Fuente is unable to establish a particular element of his claim, Mr. De La Fuente is highly prejudiced in attempting to respond. He cannot, by reviewing the Motion, determine the particular "undisputed facts" urged to the Court by Padilla; nor can he reasonably tell which element(s) or portions of his claim Padilla alleges cannot be established as a matter of law.

Rather, Mr. De La Fuente is effectively being required to try to hit a moving target by producing evidence in a shotgun fashion, due to Padilla's failure to clearly identify the legal basis for his motion and undisputed facts. Mr. De La Fuente is improperly put in a position where he must guess as to the basis and support for Padilla's Motion, in hopes that his evidence addressing the facts/issues purported raised by Padilla, which are not at all clear from the papers.

Indeed, Padilla's Notice of Motion appears to confirm that he does not consider this matter appropriate for summary judgment at all. Rather, Defendant Padilla's position, which is also evident in the arguments made in the moving papers, is that "the case concerns issues of law only, with no material factual disputes." [Dkt. # 49] Notice of Motion at 2:6-8. He apparently contends that the Court can decide the issue simply by reference to the statutory scheme. *Id* at 2:13-22 (stating that the basis for the motion is that the statutory scheme does not impose a severe burden on would be independent candidates, and any such burden is justified by California's interests in orderly administration of elections and avoiding voter confusion.).

Defendant Padilla appears to assume, incorrectly, that the challenge is simply a facial one, which may be decided in a vacuum by reference solely to the statute. Rather, as all of the cases cited above make clear, the balancing test requires the thorough consideration of evidence as to the need for and application of the statute in practice, both generally and with respect to the Plaintiff in this case. See e.g. *Bergland v. Harris*, 767 F.2d 1551, 1554 (11th Cir. 1985) ("The affidavits filed by the State in this case [as to the necessity of a state filing deadline ] are simply inadequate to allow a court to conduct such a weighing of interests. The State must introduce evidence to justify both

the interests the State asserts and the burdens the State imposes on those seeking ballot access."). The *Bergland* Court instructed the district court to "sift through the conflicting evidence and make findings of fact as to the difficulty of obtaining signatures in time to meet the early filing deadline." *Bergland v. Harris*, supra, 767 F.2d at 1555, citing *Mandel v. Bradley*, 432 U.S. 173, 178, 97 S. Ct. 2238, 2241 (1977).

Padilla's assumption that he need not introduce evidence beyond the statute itself, combined with Padilla's failure to identify any material facts in his moving papers, much less provide evidence that such facts are not disputed, is fatal to his Motion for Summary Judgment.[4]

Padilla has failed to comply with Local Rule 56-1, and has failed to otherwise plainly identify facts which are purportedly undisputed in his moving papers. As a result, Mr. De La Fuente cannot identify and respond to specific factual claims. The Court should therefore deny Defendant Padilla's Motion for Summary Judgment for failure to properly support his Motion with facts and evidence.

## III. PADILLA'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE HE FAILED TO MEET HIS BURDEN OF PRODUCTION

As noted above, Defendants Padilla cannot simply argue that the Court should summarily dismiss Mr. De La Fuente's Complaint, without providing any allegedly undisputed facts as to material issues. Defendant Padilla fails to offer any evidence as to many of the factors at issue in a case of this nature. Where Padilla does address the burden vs. state interest test, he simply cites to various case authority, unsupported by any actual material facts. The "facts" which he does offer via a Request for Judicial

---

[4] The facts which Padilla has asked the Court to take judicial notice of do not change the analysis. Most are not material to the issue to be decided. The only 'fact' which Padilla appears to rely to justify the statute is that more than 5 total candidates have made the California presidential ballot for several elections. However, as examined in more detail below, this fact fails to address the issue–the burden on independent candidates. As Mr. De La Fuente has shown, California's statutory scheme has allowed for only 2 such candidates, ever. Thus, this single facts does not assist Mr. Padilla's argument.

Notice, do not warrant summary judgment in his favor.

All that Padilla offers as allegedly undisputed facts is purported evidence of other states' laws, and historical data as to the number of <u>total</u> presidential candidates on past California ballots. While this information may be relevant, it clearly is not dispositive. The total number of candidates on the ballot does not demonstrate whether it is unduly difficult for an <u>independent candidate</u> to get on the ballot. In fact, only two independent presidential candidates, John B. Anderson in 1980 and Ross Perot in 1992, have ever made the California ballot.

Further, a  law is not constitutional simply because other, allegedly similar laws are on the books in other states. Padilla has taken these statutes out of context. In fact, as Mr. Winger's declaration demonstrates, California's statute is one of the most onerous in the nation.

As the moving party, it was incumbent on Padilla to provide the Court with specific facts that negate elements of Mr. De La Fuente's claim, as a matter of law. However, Padilla failed to do so and has improperly taken the route which the Eleventh Circuit explicitly rejected, by asking this Court to dismiss Mr. De La Fuente's claim simply because the same or allegedly similar statutes have been previously upheld in other contexts.

> The Georgia Secretary of State and the State of Georgia moved to dismiss this case contending that past decisions of the United States Supreme Court and the United States Court of Appeals for the Eleventh Circuit have conclusively resolved the issue. The Defendants referenced a number of cases where a 5% petition-signature requirement for non-statewide ballot access was upheld and reasoned that if a 5% requirement was constitutional, the lower 1% requirement must also be constitutional. Though none of the cases Georgia referenced considered ballot access for a presidential election, the district court agreed with Georgia Defendants reasoning and dismissed the action for failure to state a claim.

*Green Party of Ga. v. Georgia*, 551 F. App'x 982, 983 (11th Cir. 2014).

The Eleventh Circuit said that the District Court got it wrong by simply applying

---

a percentage or other litmus test. *Green Party of Ga. v. Georgia*, 551 F. App'x 982, 984 (11th Cir. 2014), citing *Anderson v. Celebrezze*, supra 460 U.S. at 789 ("The district court's approach employs the type of "litmus-paper test" the Supreme Court rejected in *Anderson*. And, the district court failed to apply the *Anderson* balancing approach.").

The Court of Appeals remanded the case and instructed the District Court that it must properly apply the *Anderson* factors test to the particular facts of its case, not simply approve or disapprove a statute based on a percentage figure.

Padilla is asking the Court to apply the same faulty 'litmus test' logic to the statute based on percentages, in an attempt to avoid the factual issues which are required to be considered and determined under *Anderson*. Simply put, Padilla is asking the Court to apply the wrong standard.

Because Padilla urges the Court to make a decision based almost solely off of the statutory language, he has failed to produce the evidence necessary to satisfy his burden of production. This would have required affidavits and other evidence showing the lack of burden on Mr. De La Fuente and other similarly situated would-be candidates, and evidence showing the importance of legitimate state interests served by the statute. He has failed to provide the Court with *any such evidence*. This failure is fatal to his Motion for Summary Judgment. *Bergland v. Harris*, 767 F.2d 1551, 1554 (11th Cir. 1985) ("The State must introduce evidence to justify both the interests the State asserts and the burdens the State imposes on those seeking ballot access.").

## IV.   PADILLA'S MOTION FOR SUMMARY JUDGMENT MUST BE DENIED BECAUSE THERE ARE DISPUTED ISSUES OF MATERIAL FACT

### A.   THE LEVEL OF SCRUTINY

*Anderson v. Celebrezze* and *Burdick v. Takushi* lay out the analytical framework for determining whether a ballot access law is constitutional. 460 U.S. 780, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983), and 504 U.S. 428, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992), respectively.

In *Anderson*, the Supreme Court put forth the following balancing test to

determine whether statutory ballot access laws are unconstitutional.

> [A] court must . . . . first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson v. Celebrezze*, supra, 460 U.S. at 789; see also *Ariz. Green Party v. Reagan*, 838 F.3d 983, 988 (9th Cir. 2016).

"In *Burdick*, the Court refined its analysis as to the degree of rigor required in weighing a restriction's burden on ballot access rights against the state's interest." *Ariz. Green Party v. Reagan*, supra, 838 F.3d at 988.

> [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance. But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.

*Burdick v. Takushi*, supra 504 U.S. at 434.

"We have summarized the Supreme Court's approach as a "balancing and means-end fit framework." *Ariz. Green Party v. Reagan*, supra, 838 F.3d at 988, quoting *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 2016 U.S. App. LEXIS 16263, 2016 WL 4578366, at *3 (9th Cir. 2016) (en banc). "This is a sliding scale test, where the more severe the burden, the more compelling the state's interest must be, such that "a state may justify election regulations imposing a lesser burden by demonstrating the state has important regulatory interests." *Id*, citing *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 729-30 (9th Cir. 2015), cert. denied, 136 S. Ct. 823, 193 L. Ed. 2d 718 (2016) (internal citations, alterations, and quotation marks omitted); see also *Green Party of Ga.*

---

1   v. Kemp, 171 F. Supp. 3d 1340, 1367 (N.D. Ga. 2016) "(Accordingly, Anderson and its

2   progeny dictate that the Court apply more of a sliding scale than the tiered levels of

3   review.").

4        Thus, although many cases speak in terms of strict or reduced levels of scrutiny.

5   The appropriate approach is a sliding scale to determine if the interests advanced by the

6   State justify the means used, in light of the burden on the Constitutional rights of the

7   candidate and voters. Mr. De Le Fuente submits that, under any level of scrutiny

8   authorized by the case law, Padilla has not demonstrated that the statute is Constitutional

9   as a matter of law.

10   **B.   THE   QUESTION   FOR   THE   COURT   IS   WHETHER   A**

11   **REASONABLY DILIGENT INDEPENDENT CANDIDATE CAN BE**

12   **EXPECTED TO SATISFY CALIFORNIA'S REQUIREMENTS BY**

13   **OBTAINING THE REQUIRED NUMBER OF VALID SIGNATURES**

14   **IN THE TIME ALLOWED**

15        Defendant Padilla misleadingly suggests that the Court is to look at the entire state

16   election scheme to determine the burden imposed on Mr. De La Fuente. [Doc # 49-1]

17   Padilla P&As at 6:22-24. Thus, Padilla argues throughout his brief, that the Court should

18   consider all the various ways a candidate might get on the ballot, major party, minor

19   party, and independent. [Dkt. # 49-1] at 11:21-12:8, 13:25-14:21 and 14:22-15:1.

20        Although the case cited in support of this proposition, Arizona Libertarian Party

21   v. Reagan, does contain language to the effect that the Court should look at the entire

22   scheme regulating ballot access, a closer review confirms that the Court meant all the

23   statutes taht govern access to the ballot access by a particular means. Thus, the proper

24   scope of inquiry is the burden placed on a candidate seeking ballot access by a particular

25   means (i.e. as an independent candidate). 798 F.3d 723, 730 (9th Cir. 2015).

26        The language quoted in Reagan was taken from Munro v Socialist Workers Party.

27   479 U.S. 189 (1986). However, the Supreme Court cases which Munro relied on in

28   support of this statement make it plain that the relevant inquiry is the entirety of the

scheme for independent candidates to access the ballot via petition, not <u>all</u> means of accessing the ballot. Thus, *Mandel* reversed and remanded where the District Court invalidated a ballot access statute simply by reference to the filing deadline.

> The District Court did not sift through the conflicting evidence and make findings of fact as to the difficulty of obtaining signatures in time to meet the early filing deadline. It did not consider the extent to which other features of the Maryland electoral system -- such as the unlimited period during which signatures may be collected, or the unrestricted pool of potential petition signers -- moderate whatever burden the deadline creates. It did not analyze what the past experience of independent candidates for statewide office might indicate about the burden imposed on those seeking ballot access. Instead, the District Court's assumption that the filing deadline by itself was per se illegal -- as well as the expedited basis upon which the case necessarily was decided -- resulted in a failure to apply the constitutional standards announced in Storer to the statutory provisions here at issue.

*Mandel v. Bradley*, 432 U.S. 173, 178, 97 S. Ct. 2238, 2241 (1977).

*Storer* specifically and at length held that the appropriate scope of inquiry is the statutory scheme and its impact on an independent candidate's ability to access the ballot, <u>not</u> the ability of any would be candidate to access the ballot via various means laid out in the statutory scheme. In that case, as here, California argued that there are other ways to access the ballot which mitigate the burden on the woud-be candidate.

> Appellees insist, however, that the signature requirements for independent candidates are of no consequence because California has provided a valid way for new political parties to qualify for ballot position, an alternative that Hall could have pursued, but did not. Under § 6430, new political parties can be recognized and qualify their candidate for ballot position if 135 days before a primary election it appears that voters equal in number to at least 1% of the entire vote of the State at the last preceding gubernatorial election have declared to the county clerks their intention to affiliate with the new party, or if, by the same time, the new party files a petition with signatures equal in number to 10% of the last gubernatorial vote. It is argued that the 1% registration requirement is feasible, has recently been resorted to successfully by two new political parties now qualified for the California ballot, and goes as far as California constitutionally must go in providing an alternative to the direct party primary of the major parties.

*Storer v. Brown*, 415 U.S. 724, 744-45, 94 S. Ct. 1274, 1286 (1974)

The *Storer* Court found that California's argument missed the mark then, just as it does now.

> It may be that the 1% registration requirement is a valid condition to extending ballot position to a new political party. **But the political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other.** A new party organization contemplates a statewide, ongoing organization with distinctive political character. Its goal is typically to gain control of the machinery of state government by electing its candidates to public office.   From the standpoint of a potential supporter, affiliation with the new party would mean giving up his ties with another party or sacrificing his own independent status, even though his possible interest in the new party centers around a particular candidate for a particular office. For the candidate himself, it would mean undertaking the serious responsibilities of qualified party status under California law, such as the conduct of a primary, holding party conventions, and the promulgation of party platforms.  **But more fundamentally, the candidate, who is by definition an independent and desires to remain one, must now consider himself a party man, surrendering his independent status.   Must he necessarily choose the political party route if he wants to appear on the ballot in the general election? We think not.**

*Storer v. Brown*, 415 U.S. 724, 745-46, 94 S. Ct. 1274, 1286-87 (1974), emphasis added.

The appropriate inquiry is whether "a reasonably diligent independent candidate be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot? Past experience will be a helpful, if not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not." *Storer v. Brown*, 415 U.S. 724, 742-43, 94 S. Ct. 1274, 1285 (1974); see also *Nader v. Cronin*, 620 F.3d 1214, 1218 (9th Cir. 2010) ("Appellants here have <u>failed to show Hawaii's election scheme imposes a severe burden on independent candidates for president</u> even in light of an examination of Hawaii's regulatory scheme as a whole.") emphasis added.

## C.   <u>THE CASES RELIED UPON BY PADILLA DO NOT SUPPORT HIS REQUEST FOR SUMMARY JUDGMENT</u>

Defendant Padilla largely relied on *Nader v. Cronin* and *Cross v. Fong Eu.*   620 F.3d 1214 (9th Cir. 2010) & 430 F.Supp. 1036 (N.D. Cal. 1977).   Both are

---

distinguishable from the present case, and do not support the relief sought by Padilla at this stage of the proceedings.

### 1.   NADER V. CRONIN

First, the law at issue in *Cronin* required a petition to contain signatures of 1% of the <u>number of votes cast</u> statewide in the last presidential election. *Nader v. Cronin*, 620 F.3d at 1216. That amounted to a grand total of 3,371 signatures required. *Id*.

The California law at issue in this case requires a petition to contain signatures of 1% of <u>all registered voters</u>. This was 179,039 total signatures in 2016. The gross number of signatures required by California is not greatly simply because of its larger population. It is also greatly because the pool from which signature requirements are measured are smaller under the Hawaii law at issue in *Cronin*.

Second, as noted at length in the accompanying Declaration of Richard Winger, although laws are often stated in terms of a percentage of registered or actual voters, the better method of determining the burden of a statutory signature requirement is the total number of signatures required. Decl. Winger at ¶¶ 26-29. Thus, while a specific percentage requirement may be appropriate or reasonable for a smaller state, that same percentage would be a virtually insurmountable obstacle for would be candidates in states with a large population.

Third, the statute at issue in *Cronin* had an unlimited time period for obtaining signatures (i.e. it had no start date).  In contrast, the California statutory scheme has a 105 day window to obtain the required signatures.

So, Hawaii required 3,371 signatures in an essentially unlimited time period, while California requires 179,039 signatures, all obtained in a 105 day window. This does not include the additional signatures needed to account for unverified or disqualified signatures.

Given Hawaii's low gross number (3,371) and unlimited window to obtain signatures, it is no wonder that the Ninth Circuit had little difficulty finding summarily that the statute imposed a minimal burden on would be independent candidates. Padilla

---

implicitly acknowledges that the *Cronin* Court did not engage in a detailed *Anderson* balancing test analysis (perhaps because the number of signatures required was obviously attainable with reasonable effort), and instead provided a 'cursory analysis.' [Dkt # 49-1] at 9:7-10.[5]

However, it is clear that the burden in California is not "light" as in Hawaii. The total number of signatures required, combined with the limited window of time to obtain them, makes *Cronin* clearly distinguishable from this case.

Notably, as Padilla points out, the *Cronin* Court relied on *Jenness v. Fortson* case, which upheld Georgia's 5% of registered voters requirement. However, as noted in the cases cited above, particularly *Bergland*, *Jenness* (and a number of other cases relied on by Padilla) dealt with a state election, specifically challenges by would be gubernatorial and congressional candidates. "The difference between state and local offices and federal offices, stressed by plaintiffs in this case, requires a different balance than that used in weighing the state interests against the burdens placed on candidates for statewide and local offices in *Jenness, McCrary*, and *Libertarian Party*." *Bergland v. Harris,* 767 F.2d 1551, 1554-55 (11th Cir. 1985). Simply put,  Presidential elections require a different weighing of interests when engaging in the balancing test, taking into account the *reduced* state interest in presidential elections.

> [I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important  national interest. ... Moreover, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States. Thus in a Presidential election a State's enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders. Similarly,

---

[5] Indeed, *Cronin* is a per curium opinion, in which the Court did not delve into the burden vs. state interest balancing test in depth, apparently because of the minimal number of signatures required, and Plaintiffs failure to develop any detailed factual record beyond the signature requirement itself. Indeed, the Plaintiffs in *Cronin* appeared to have directed their challenge primarily at the discrepancy between the treatment of would be independent candidates and qualifying political parties. *Nader v. Cronin*, 620 F.3d 1214, 1217 (9th Cir. 2010) ("Appellants argue, however, that we must examine the burden as compared to the burden for qualifying as a party, relying on the disparity in the signature requirements.").

> the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries.

See e.g. *Anderson v. Celebrezze*, 460 U.S. 780, 794-95, 103 S. Ct. 1564, 1573 (1983).

When Georgia's statute was actually challenged subsequently in the context of a presidential ballot, it was found unconstitutional, even after the legislature had reduced the signature requirement from 5% to 1% of registered voters. *Green Party of Ga. v. Kemp*, supra, 171 F.Supp.3d at 1372. If that sounds familiar to the Court, it is because it is virtually identical to California's statutory scheme being challenged by Mr. De La Fuente. Georgia actually provides for additional time, 180 days, to obtain the required signatures, and the total number of signatures required at the time the statute was invalidated was 50,334. *Id* at 1347.

To recap, a statute with an identical percentage and pool requirements (1% of registered voters), a smaller total number of signatures needed (50,334 to 179,039, and a smaller window to obtain the necessary signatures (180 days to 110 days), was found to be an unconstitutional burden on would be independent candidates. The Georgia district court permanently enjoined enforcement of the 1% requirement, and established a 7,500 signature petition requirement until the legislature passes permanent replacement legislation. The district court was affirmed by the Eleventh Circuit

The *Green Party of Ga.* case is far more similar to this case than *Cronin*, and, if anything, justifies Summary Judgment in favor of Mr. De La Fuente on the record before the Court. At minimum, *Cronin* is distinguishable in light of the facts in the record, such that the Court cannot grant Summary Judgment in favor of Mr. Padilla.

## 2.    CROSS V. FONG EU

*Cross v. Fong Eu* is also easily distinguished from the present case. 430 F. Supp. 1036 (N.D. Cal. 1977). *Cross* is a district court case from 1977, decided well before much of the jurisprudence which must inform the Court's decision in 2017.

Further, the Plaintiff in *Cross* was pro per. This is important because, as is

apparent from the decision, the Court had difficulty sorting out the actual basis for the claim in light of a laundry list of amorphous complaints. *Cross v. Fong Eu*, 430 F. Supp. 1036, 1039 (N.D. Cal. 1977) ("The loose narrative style and string citations of statutes in the complaint makes it difficult to isolate specific claims.  The Court has thoroughly examined the allegations of the complaint and the statutes challenged ... and finds no merit to any of plaintiff's claims therein.").

The *Cross* Court was also presented only with Equal Protection claims. Plaintiff alleged that the filing we was discriminatory based on sex and wealth, and that the signature requirements discriminate against nonparty candidates vis a vis qualified party candidates. *Cross v. Fong Eu*, 430 F. Supp. 1036, 1039 (N.D. Cal. 1977). In contrast, Mr. De La Fuente raises Due Process Claims, and therefore the analysis in *Cross* does not apply with equal force here.[6]

In addition, *Cross* dealt with a challenge to the statute as it applies to state office, Senator. It did not engage in the required analysis for Presidential ballot claims. "The difference between state and local offices and federal offices ... requires a different balance than that used in weighing the state interests against the burdens placed on candidates for statewide and local offices." *Bergland v. Harris*, 767 F.2d 1551, 1554-55 (11th Cir. 1985).

> Furthermore, in the context of a Presidential election, state-imposed restrictions   implicate a uniquely important national interest.  For the President and the Vice President of the United States are the only elected officials who represent

---

[6] Moreover, it is clear that the Plaintiff in *Cross* was not in any way a serious candidate, and there appear to be no facts which would have allowed the Court to engage is a real balancing analysis as required by subsequent case law. *Cross v. Fong Eu*, 430 F. Supp. 1036, 1042 n.6 (N.D. Cal. 1977) ("Indeed, plaintiff's situation illustrates well the state's legitimate policy interest underlying these requirements.  If every person who could obtain 200-300 signatures received a place on a state-wide ballot, political chaos would ensue and rational voter choice would be impossible."). This is not Mr. De La Fuente's position. Rather, as explained in detail by Mr. Winger, whose analysis was accepted by the Court in the *Green Party of Ga.* case, a petition requirement of more than 5,000 signatures amply protects the State's interest in avoiding a 'laundry list' ballot, while avoiding an undue burden on would be independent candidates.

all the voters in the Nation.  Moreover, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States.  Thus in a Presidential election a State's enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders.  Similarly, the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries. ...The Ohio filing deadline challenged in this case does more than burden the associational rights of independent voters and candidates. It places a significant state-imposed restriction on a nationwide electoral process.

*Anderson v. Celebrezze*, 460 U.S. 780, 794-95, 103 S. Ct. 1564, 1573 (1983).

## D.   THERE ARE MATERIAL ISSUES OF FACT WHICH REQUIRE THAT THE COURT DENY PADILLA'S MOTION

"[T]he issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986).

### 1.   CALIFORNIA'S INDEPENDENT PRESIDENTIAL BALLOT ACCESS STATUTE UNDULY BURDENS THE CONSTITUTIONAL RIGHTS OF MR. DE LA FUENTE AND THE VOTERS AT LARGE

The right to vote, the right to associate for political purposes, and the right to be a political candidate are fundamental Constitutional rights protected by the First and Fourteenth Amendments. See *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Eu v. San Francisco County Democratic Central Committee,* 489 U.S. 214, 224 (1989); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986); *Anderson v. Celebreze*, 460 U.S. 780, 787 (1983).

Ballot access laws burden "two different, although overlapping kinds of rights - the rights of individuals to associate for the advancement of political beliefs, and the

---

right of qualified voters regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms." *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968).

A regulation imposes a severe speech restriction if it "significantly impair[s] access to the ballot, stifle[s] core political speech, or dictate[s] electoral outcomes. *Chamness v. Bowen*, 722 F.3d 1110, 1116 (9th Cir. 2013). "The right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are 'clamoring for a place on the ballot.'" *Anderson*, 460 U.S. at 787, citing *Lubin*, 415 U.S. at 716). "The exclusion of candidates also burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying-point for like-minded citizens." *Id*.

The Supreme Court has recognized that "it is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues." *Lubin v. Panish*, 415 U.S. 709, 716 (1974).

> "A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. It discriminates against those candidates and -- of particular importance -- against those voters whose political preferences lie outside the existing political parties." *Anderson v. Celebrezze*, supra, 460 U.S. at 793-94.

The burdens imposed by California's statutory scheme are plain. It has the highly raw number of voter signatures required in the nation. California has a short window of time to obtain those signatures. No one since billionaire Ross Perot has overcome the obstacles imposed by the statute. The State has made no showing that a would-be candidate with 'reasonable diligence' could get on the ballot by this petition method. At minimum, there are issues of fact which prevent summary judgment in favor of Defendant Padilla.

## 2.   **PADILLA'S ARGUMENTS AS TO THE BURDEN IMPOSED BY CALIFORNIA ARE UNCONVINCING**

Defendant Padilla claims that California's time frame is generous and comparable to other states by identifying various deadlines to submit signatures. [Dkt # 49-1] at 15:20-16:11-15. However, this is misleading in that Padilla fails to establish the start date for other states, so that a comparison of the total available time to gather the required number of signatures is possible.

Padilla also claims that the burden imposed by California's signature requirement is light (Dkt # 49-1at 9:8-10), comparing California to the Hawaii statute at issue in *Cronin*. However, Padilla fails to inform the Court that 1) Hawaii has no start date, and therefore a virtually unlimited window in which to obtain signatures, and 2) much more importantly, Hawaii only required a candidate to obtain 3,371 signatures at the time the *Cronin* Court considered the burden. *Nader v. Cronin*, 620 F.3d 1214, 1216 (9th Cir. 2010)("These candidates had to submit petitions with 3,711 signatures ... 60 days before the general election...").

As noted in the Statement of Facts, above, Padilla spends considerable effort discussing other purported ways for ballot access, under the assumption that such avenues should be considered by the Court in determining the burden imposed. [Dkt # 49-1] at 11:21-12:8; 13:25-14:21 and 14:22-15:1. However, *Storer* makes it clear that the proper consideration is the avenue pursuant to which an independent candidate can access the ballot, not all potential avenues for ballot access. *Storer v. Brown*, supra, 415 U.S. at 745-46 ("Must [the candidate] necessarily choose the political party route if he wants to appear on the ballot in the general election? We think not.").

Moreover, Padilla fails to articulate the difficulty of these other methods. He fails to establish how difficult it is to obtain a major party nomination (clearly not an easy task); nor does he provide the Court with information about the ease of ballot access by forming a new party. In fact, California's statute for obtaining ballot access by forming a new qualified party is even more onerous that the statutory scheme challenged by Mr. De La Fuente.

California required minor parties to obtain signatures equal to 10% of the voters

in the last gubernatorial election, which amounts to some 751,398 signatures.[7] In contrast, Hawaii's statutory scheme permits a political party to qualify for the ballot with 1/10 of 1% of registered voters, an amount currently equal to 750 total signatures.[8]

### 3. THE ONEROUS REQUIREMENTS OF CALIFORNIA ELECTION CODE §§ 8400 AND 8403 ARE NOT NECESSARY TO PROTECT CALIFORNIA'S INTEREST IN PREVENTING BALLOT OVERCROWDING AND AVOIDING VOTER CONFUSION

Padilla argues that California has a legitimate interest in avoiding overcrowding, which could cause voter confusion, by requiring a modicum of support. Mr. De La Fuente does not disagree that this is a valid interest in theory. He simply disagrees that California's statutory scheme is even minimally related to what is necessary to ensure the ballot is not overcrowded in practice.

> [O]ur previous opinions have also emphasized that "even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty," [Citation omitted] and we have required that States adopt the least drastic means to achieve their ends. This requirement is particularly important where restrictions on access to the ballot are involved. The States' interest in screening out frivolous candidates must be considered in light of the significant role that third parties have played in the political development of the Nation. Abolitionists, Progressives, and Populists have undeniably had influence, if not always electoral success. As the records of such parties demonstrate, an election campaign is a means of disseminating ideas as well as attaining political office.

---

[7]  http://www.sos.ca.gov/elections/political-parties/political-party-qualification/ "To qualify a new political party by petition, no later than 135 days prior to the primary election or the presidential general election, the Secretary of State must determine if a political body intending to qualify collected petition signatures of registered voters equal to 10 percent of the votes cast at the last gubernatorial election. (Elections Code §§ 5100(c), 5151(d).) The current signature requirement is 751,398 (10% of 7,513,972, the votes cast at the November 4, 2014."

[8]  http://elections.hawaii.gov/political-parties/qualification/ "The petition must contain 750 signatures of currently registered voters in the State of Hawaii. This constitutes not less than one-tenth of one percent of the total registered voters of the state as of the last preceding general election."

---

*Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185-86, 99 S. Ct. 983, 991 (1979).

Notably, Padilla fails to articulate what a modicum of support is, other than to make the circular argument that 1% of California's eligible voters represents such support. [Dkt # 49-1] at 8:14-16. However, as explained by Mr. Winger, a much lower raw number of signatures is sufficient to avoid overcrowding, and also represents a modicum of support. See Decl. Winger; see also <u>The Wolters Kluwer Bouvier Law Dictionary Desk Edition</u> (which defines "Modicum" as: "Small in quantity or size. Modicum refers to relative smallness or scarcity in number. Thus, a modicum of punishment is a small punishment, and a modicum of evidence is a slight quantity of evidence.").

Defendant Padilla suggests that the Secretary need do no more than invoke the oft repeated State interests as a sort of talisman against challenges, without the need to produce any actual evidence in support of these stated interests. See [Doc # 49-1] at 17:16-18:2, relying on *Munro v. Socialist Workers Party*, 479 U.S. 189 (1986). Defendant's position is misplaced and takes the quoted language from *Munro* out of context.

*Munro* dealt with a prospective challenge to a law which had just taken effect. Thus, the Court in Munro noted that "[w]e have never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies <u>prior to the imposition</u> of reasonable restrictions on ballot access. *Munro v. Socialist Workers Party*, supra, 479 U.S. at 194-95, emphasis added. "Such a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action." *Id* at 195-96.

The Court also noted that, in any event, the record indicated that the State was in fact reacting to actual overcrowding under its prior statutory scheme. The State enacted its new law in light of the fact that 12 minor party candidates appeared on the last general election ballot under the prior statute, which only required that a convention nominated

minor candidate obtain 100 signatures of voters who had not voted in the primary. *Id* at 192-92, 196.

More importantly, *Munro* was not a presidential ballot access case. In presidential ballot access cases, the State's interests are less important than in other elections.

> [A] state's interest in regulating a presidential election is less important than its interest in regulating other elections because the outcome of a presidential election "will be largely determined by voters beyond the State's boundaries" and "the pervasive national interest in the selection of candidates for national office . . . is greater than any interest of an individual State." Consequently, a ballot access restriction for presidential elections "requires a different balance" than a restriction for state elections.

*Green Party of Ga. v. Georgia*, 551 F. App'x 982, 984 (11th Cir. 2014), quoting *Anderson v. Celebrezze*, 460 U.S. 780, 795, 103 S. Ct. 1564, 1573, 75 L. Ed. 2d 547 (1983) and *Bergland v. Harris*, supra, at 1554.

In cases evaluating the impact of a longstanding ballot access law respecting presidential elections, the Court can and must insist that the State provide actual evidence, as opposed to simply repeating its allegedly interests as if they were facts. See e.g. *Bergland v. Harris*, 767 F.2d 1551, 1554 (11th Cir. 1985) ("The affidavits filed by the State in this case [as to the necessity of a state filing deadline ] are simply inadequate to allow a court to conduct such a weighing of interests. **The State must introduce evidence to justify both the interests the State asserts and the burdens the State imposes on those seeking ballot access**."), emphasis added.

As in *Green Party of Ga.,* Defendant Padilla "offers no evidence of voter confusion." *Green Party of Ga. v. Kemp*, 171 F. Supp. 3d 1340, 1368. "Of course, the State has a theoretical interest in avoiding voter confusion. But Plaintiffs provided evidence that the danger of voter confusion in this case is no more than theoretical." *Id* at 1368.

As in *Green Party of Ga.,* Defendant Padilla, relying on *Munro*, claims it is not required to make such showing. *Green Party of Ga. v. Kemp*, supra, 171 F. Supp. 3d at 1366 n.16. But, Defendant Padilla was not asked to "demonstrate actual confusion prior

to enactment of a regulation." *Id*. Instead, the question is whether "there is evidence in the record to create a genuine issue of material fact as to the State's need to avoid voter confusion in this challenge." *Id.*

The Court found that the State of Georgia had not shown that a lower number of petition signatures would result in an overcrowded ballot or voter confusion. Relying largely on similar evidence to that presented by Mr. De La Fuente in this case, the Court found that significantly lower gross petition signature requirements do not result in a proliferation of candidates on the general election ballot in presidential races.

> Thirty-eight states plus the District of Columbia allow presidential ballot access with 10,000 or fewer signatures. Twenty-one states imposed petition requirements of between 2,500 and 10,000 signatures during the four presidential elections between 2000 and 2012. In only one instance during that period did any of those 21 states have more than seven presidential candidates on the general election ballot. The overall average for these states during that period was 5.3 candidates.

*Green Party of Ga. v. Kemp*, 171 F. Supp. 3d 1340, 1369 (N.D. Ga. 2016).[9]

Here, Defendant Padilla has not provided sufficient (or any) material evidence to showing it has a real (as opposed to theoretical) and important regulatory interest in avoiding voter confusion by requiring independent presidential candidates to obtain over 200,000 signatures (as a practical matter) in 105 days.

In contrast, Mr. De La Fuente has offered actual evidence demonstrating that California's statutory scheme is vastly more burdensome than is necessary to weed out frivolous candidates. See Decl. De La Fuente and Winger. Candidates can show a modicum of support with a raw number requirement of more than 5,000 qualified signatures. As in *Green Party of Ga. v. Kemp*, California's statutory scheme is "not narrowly tailored to advance the State's interests," and "requiring a lower number would

---

[9] The Court also noted that, as in California, Georgia has a large number of primary candidates on the presidential ballot, without any apparent confusion or fragmentation of the vote. "[T]he Presidential Preference Primary ballots in Georgia contain far more candidates than the general election ballots, and Defendant offered no evidence to show that the number of candidates had caused voter confusion." CITE.

ease the burden on voters' and political bodies' rights while serving the State's interest in avoiding voter confusion and a crowded ballot." 171 F.Supp.3d at 1366.

## V.   **CONCLUSION**

The Court should deny Padilla's Motion for Judgment on the Pleadings because this matter cannot be decided solely from a review of the pleadings. It requires a necessarily fact intensive inquiry and balancing of burdens versus state interests.

The Court should deny Defendant Padilla's Motion for Summary Judgment, because he has 1) failed to meet his burden of production, 2) has failed to comply with Local Rule 56-1, 3) has failed identify the undisputed material facts or lack of evidence which entitle him to judgment as a matter of law, and 4) has failed to proffer any material evidence which would entitle him to judgment as a matter of law.

For the foregoing reasons and based on the facts and argument contained herein, Plaintiff Roque De La Fuente respectfully requests that the Court Deny Defendant Alex Padilla's Motion for Judgment on the Pleadings, or Alternatively, Motion for Summary Judgment.

Dated: June 30, 2017                    **SCUDI & AYERS, LLP**


By:  s/J. Ray Ayers
              Morgan J.C. Scudi
              J. Ray Ayers
              Lucas I. Mundell
              Attorneys for Plaintiff,
              *Roque "Rocky" De La Fuente*