SCUDI & AYERS, LLP
Morgan J.C. Scudi (SBN 147942)
Lucas I. Mundell (SBN 310367)
5440 Morehouse Drive, Suite 4400
San Diego, California 92121
Phone: (858) 558-1001
Fax: (858) 558-1122
Lucas@RDLFG.com

Attorneys for Plaintiff, *Roque "Rocky" De La Fuente*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROQUE "ROCKY' DE LA FUENTE,<br><br>    Plaintiff,<br><br>vs.<br><br>STATE OF CALIFORNIA and ALEX PADILLA, CALIFORNIA SECRETARY OF STATE,<br><br>    Defendants. | CASE NO. 2:16-CV-03242-MWF-GJS<br><br>**DECLARATION OF RICHARD WINGER IN SUPPORT OF OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS/SUMMARY JUDGMENT**<br><br>Judge: Hon. Michael W. Fitzgerald<br>Ctrm: 5A<br>Hearing Date: July 24, 2017<br>Time: 10:00AM |

1

I, RICHARD WINGER, declare:

1. I am over the age of 18 and competent. I have personal knowledge of the facts stated in this declaration and, if sworn as a witness, could testify competently thereto. I do hereby make this declaration to be used in the above-entitled case, and being duly sworn depose and say as follows:

2. I earned my Bachelor of Arts in Political Science at University of California, Berkeley in 1966, and conducted graduate studies in Political Science at University of California, Los Angeles from 1966 through 1967. I am the creator and Editor of *Ballot Access News*, a free and non-partisan internet and paper publication regarding American ballot access news nationwide. I update the *Ballot Access News* daily, and I produce and distribute the paper publication on a monthly basis. I began *Ballot Access News* in 1985 and continue to operate the publication to date. I am currently on the Editorial Board of *Election Law Journal*, the leading peer-reviewed publication on election design and reform. A true and correct copy of my current *C.V.* is attached hereto as Exhibit 1.

3. I have dedicated 52 years to the study of election law and ballot access. I primarily rely on my own research and investigation, as there were very few formal resources on the topic when I began my studies in the field. My research generally consists of the following methods/practices:

4. I started in 1965 by requesting all of the election codes from each of the state government offices via mail. I researched the origin and legislative intent of each state's ballot access laws using the Stanford law library stacks. The Stanford had copies of all the past election codes and related statutes. I researched the publications of nationally organized minor parties, dating back to the late 19th century. In studying minor parties, I also examined the various ballot access struggles they encountered. I have collected election returns back to 1870 for all states, for all statewide offices, and U.S. House of Representatives. I have collected data about the number of registered voters in each state dating back approximately 50 years (data collection beyond that time frame often does not exist is or is inaccurate). This data made it possible for me to

1  calculate the number of signatures for all past presidential elections, as well as midterm
2  elections, for statewide office. I have studied countless publications, academic articles,
3  essays, compendiums on ballot access laws, including a particularly essential reference
4  book published in the 1910's that described all the state ballot access laws.

5      4.    Based on these methods, and additional research, I have compiled an
6  Appendix titled "List of Instances When States Required More than 5,000 Signatures for
7  President, Together with List of Petitioning Presidential Candidates Who Met that
8  Requirement" which, as stated, shows historically how many independent presidential
9  candidates and newly qualified parties have been put on state presidential ballot via
10 petition requiring more than 5,000 signatures. A true and correct copy of that Appendix
11 is attached hereto as Exhibit 2 (hereinafter, "Appendix").

12     5.    I have been recognized as an expert witness in the areas of outsider
13 candidates and ballot access by federal courts in Alabama, Arkansas, California, New
14 York, and Oklahoma. I have appeared as a commentator on ballot access on NBC, ABC,
15 CNN, and NPR. I have been widely published and have had the privilege of appearing
16 in several speaking engagements. A more complete list of my publications, testimonial
17 and expert testimonial appearances, and speaking engagements is included in Exhibit 1.

18     6.    The purpose of this declaration is to show through historical evidence that,
19 if a state requires even slightly more than 5,000 signatures for an independent
20 presidential candidate or the presidential candidate of an unqualified (i.e. minor) party
21 to get on the ballot, it will never have an overcrowded presidential general election
22 ballot. Additionally, this declaration is intended to demonstrate that, based on the
23 historical record, the signature requirements specifically imposed by California Election
24 Code on independent presidential candidates is wildly excessive, if the actual purpose
25 is to prevent an overcrowded ballot or voter confusion, or to require the candidate to
26 demonstrate a modicum of support.

27     7. The first presidential election in which any state used government-printed
28 ballots was the 1892 election. When a state government takes responsibility for printing

general election ballots, it must have a law governing how candidates get on the ballot. As of 2012, there were 1,459 instances when a state held a presidential general election, and used a government-printed ballot. Out of those 1,459 instances, in 1,058 of them, the state provided some means for an independent presidential candidate, or the nominee of an unqualified party, to get on the ballot with a showing of support of 5,000 voters or fewer. In other words, in these 1,058 instances, the state provided "outsider" presidential candidates with access to the general election ballot with either no petition, or a petition that required a number of signatures ranging from 25 signatures to 5,000 signatures.

8. The most crowded general election ballot for president in U.S. history was the Colorado's general ballot in 2016. That year, twenty-two candidates were listed. Colorado did not require any petition at all for an independent presidential candidate, or the presidential candidate of an unqualified party; instead, the candidate simply had to pay a filing fee of $1000.

9. Arkansas, which, as recently as 1996, let any independent presidential candidate, or the presidential candidate of an unqualified party, on the ballot just by request; no fee nor petition was required. The Arkansas 1996 ballot had 13 presidential candidates. Afterwards Arkansas started requiring 1,000 signatures for such candidates.

10. However, the states that have required more than 5,000 signatures for such "outsider" candidates, but almost always far fewer than 50,000, have never had more than 8 candidates. The list of the 401 instances in which a state required "outsider" candidates to submit a petition of more than 5,000 signatures (or, in the case of California, required newly-qualifying parties to have at least 5,000 registered members) is in the Appendix.

11. The list of 401 instances where states required more than 5,000 signatures shows that, 33% of the time, no independent presidential candidate, or presidential candidate of an unqualified party, was able to complete the petition and get on the ballot (134 instances). In another 20% of the instances, only one independent candidate or unqualified party successfully completed the petition (82 instances). In yet another 20%

4

of the instances, only two candidates qualified (also 82 instances). There were an additional 13% of the instances where three candidates were able to complete the petition and qualify (51 instances). In 8% of the instances, four candidates were able to complete the petition (33 instances). In 4% of the instances, five candidates qualified (15 instances). Finally, in 1% of the instances, six candidates completed the petition hurdle (4 instances). There is not one single instance when more than six candidates or parties successfully completed the petition. In other words, out of the 401 historical instances where a state required more than 5,000 signatures to access the ballot by petition, no more than six independent or unqualified party candidates successfully reached the ballot.

12. Also, it is notable that all four instances in which six petitions succeeded were in Illinois, a state which considers all petitions and petition signatures to be valid if no challenge is made, even if the petition on its face obviously lacks the required 25,000 signatures. Even one signature on a petition will succeed, if there is no challenge. For example, the New Party got on the ballot in Illinois with just one signature in 2008. So, if Illinois is discounted, there are no historical instances with more than five successful "outsider" petitions on a presidential ballot, where the state required more than 5,000 signatures.

13. For the 2016 election, California required 178,039 signatures for an independent presidential candidate to get on the general election presidential ballot. It is obvious from the extensive historical record, that if the state interest in a petition requirement is to keep the ballot from being over-crowded or confusing, the 178,039 requirement far exceeds what is necessary.

14. To exacerbate this generally insurmountable requirement, California, unlike many other states, also requires that the entirety of these 178,039 signatures be gathered within a 105-day window. This equals 1696 signatures every day during that window, not counting additional signatures needed to account for the inevitable disqualification of a portion of the signatures.

15. California's 105-day window to gather 178,039 qualified signatures is not a generous time frame, in that the majority of states do not have a "start date" before which would be candidates cannot gather signatures. The deadline to submit signatures is generally of little consequence if no start date is prescribed, as the potential candidate has a much larger window to gather signatures. Any contention that California's 105-day window is "generous", is misleading at best.

16. California allows presidential primary candidates access to the ballot with no petition whatsoever, and no fee, if they are generally advocated for or recognized throughout the United States or California as actively seeking the nomination of a major or qualified party for President. In the Libertarian presidential primary in California in 2016, twelve candidates were listed. Having twelve candidates on that presidential primary ballot did not cause voter confusion or any other apparent harm. The 2016 Democratic presidential primary in California listed seven candidates, and that does not seem to have caused confusion.

17. Reasonable requirements can, of course, be implemented by states to prevent "vanity candidates" from unnecessarily over-crowding a presidential ballot. In my opinion, a "vanity candidate" is one who lacks even a modicum of support.

18. Such presidential candidates, i.e. those without a modicum of support, have historically never been able to obtain even 5,000 signatures. None of the parties or candidates listed in the Appendix, all of whom surmounted a petition hurdle of more than 5,000 signatures, were vanity candidates.

19. The only independent presidential candidates who have ever surmounted a petition hurdle greater than 5,000 signatures in United States presidential general election history were Ross Perot, John Anderson, Ralph Nader, Eugene McCarthy, and Lyndon LaRouche. Dwight Eisenhower is listed in the Appendix, because he qualified as an independent candidate in South Carolina in 1952, which required 10,000 signatures; also, Harry F. Byrd is listed, because independent electors pledged to him qualified in 1956 in South Carolina. All of the other entries in the Appendix were the

presidential nominees of minor parties, and virtually all of them had historical and social significance.

20. Qualifying signatures, for petition purposes, are a recognized commodity in American political campaigns. More specifically, in modern times, signatures for political petitions are generally acquired on a "price per signature" basis. This price can vary by state, district, election cycle, and urgency (impending deadline). All national candidates, generally advocated for or recognized throughout the United States as actively seeking the office of President utilize the services of companies that gather signatures for a fee. In 2016, they included Hillary Clinton, Donald Trump, and Bernie Sanders.

21. In addition to the statutorily prescribed number of qualified signatures, a prudent candidate will pro-actively gather a cushion of approximately 50% more signatures than required, because a percentage of signatures is generally disqualified for various reasons, such as address, identification and registration complications

22. Based upon the 178,039 required signatures in California for an independent presidential candidate in 2016, and the prudent gathering of an additional 50% signatures within the 105-day window, an independent presidential candidate would needed to obtain 267,058 signatures in 2016. The expense of this petition circulation would have been astronomically high to qualify for the general presidential ballot in California in 2016 via petition.

23. In California, no statewide petition to place an independent presidential candidate has succeeded since 1992, when self-funded billionaire Ross Perot qualified as an independent presidential candidate.

24. California requires more signatures for independent presidential candidates than all 49 other states. Florida's petition requirement comes in a distant second at approximately 60,000 fewer signatures. California and Florida are the only two states in the nation that required more than 100,000 signatures in 2016. The lowest signature requirement for independent presidential candidates was 275 in Tennessee in 2016. The

median number of required signatures throughout the United States for an independent candidate in 2016 was 5,000, some 173,039 less than California in 2016.

25. An independent presidential candidate seeking access to the general ballot in all 50 states in 2016 would have needed to gather approximately 821,368 valid signatures. However, California's 178,039 signature requirements in 2016 accounted for over 21.7% of all signatures required nationwide. Likewise, California, would represent over 21.7% of the total cost of accessing the ballot in all 50 states via petition.

26. The nationwide trend regarding petition signature requirements for "outsider" candidates has been towards a significant reduction in either the required raw number of signatures, or the percentage of voters' signatures needed. For example, Pennsylvania reduced required signatures by 77%, from 21,775 to exactly 5,000. See *Constitution Party v. Cortez*, 5:12-CV-02726-LS, p. 1, ¶ 2 (E.D.P.A. June 30, 2016). In 2013, Virginia legislature pro-actively reduced the required number of signatures for an independent candidate by 50%, from 10,000 to 5,000 VA S.B. 690, Ch. 521, Reg. Sess., March 18, 2016. On April 3, the Maryland House passed HB 529. It lowers the number of signatures for a statewide independent from 1% of the number of registered voters to exactly 10,000 signatures. The Oklahoma Senate has passed two bills that improve ballot access. SB 145 passed 41-2 on March 8. It eliminates the mandatory petition for independent presidential candidates, and the presidential nominees of unqualified parties, if they pay a filing fee of $17,500.

27. This trend towards a raw number of required signatures is sound. Using a percentage of registered voters is not an accurate representation of potential support because the basis (number of registered voters) is an inherently misleading number. The sum total of registered voters in a given state is generally inaccurate because of (1) poor record keeping by the state, such as in Georgia (2) the fact that several states in recent years have not maintained precise data on the number of registered voters (such as Minnesota, Wisconsin, Mississippi,

and North Dakota), and/or (3) the existence of "deadwood". Deadwood refers to erroneous voter registrations within a state that no longer reflect one person who is alive and a resident of the state. Deadwood occurs by duplicative filings (such as married women who change their maiden name), failure to remove deceased persons, multiple filings by one individual at an updated address, and people who move out of state. A reasonable raw number of signatures, or a reasonable percentage of voters who voted in the last presidential election, more accurately reflect a 'modicum of support' and better address the state's interest in avoiding voter confusion and an overcrowded ballot.

27. Only 11 states require more than 10,000 petition signatures from an independent presidential seeking access to the general election presidential ballot. Only 7 states require more than 25,000 signatures. Only 4 states require more than 45,000 signatures.

28. Based on the foregoing, and my decades of research into ballot access laws, it is my opinion that California's 1% of the number of registered voters signature requirement, in combination with the restrictive 105-day window, is prohibitively expensive and unduly burdensome for independent presidential candidates. It is not necessary to prevent an overcrowded ballot, voter confusion, or candidates on the ballot without some modicum of support.

29. It is also my opinion that a petition requirement of 5,000 or more raw signatures would address the state's concerns in avoiding an overcrowded ballot and voter confusion, while lowering the burden on independent and unqualified presidential candidates to a reasonable level.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Dated: 30 June, 2017             *Richard Winger*
                                 Richard Winger